IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


ALECIA G. PITTMAN                       )
                                        )
v.                                      )        No. 3:10-0049
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security         )



To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's

determination that the plaintiff was not disabled under the meaning of the Act is not supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the record (Docket Entry No. 20) should be granted to the extent that this case

should be remanded for further action in accordance with the recommendations contained herein.

# I. INTRODUCTION

While the plaintiff was a minor, she filed multiple applications for child's SSI in the late 1990's, and was ultimately found to be disabled due to borderline intellectual functioning based on her November 2000 application. (Tr. 8.)  In February of 2003, after the plaintiff turned 18 years old, her claim was redetermined and she was found not to be disabled under the adult SSI standard. After a hearing, Administrative Law Judge ("ALJ") William Taylor issued an unfavorable decision on May 13, 2005. (Tr. 40-44.)  The plaintiff did not seek review of the ALJ's decision.

On March 27, 2006, the plaintiff reapplied for SSI, alleging a disability onset date of November 1, 2000, due to depression, hypertension, left knee pain, asthma, diabetes, sleep apnea, right foot pain, and a learning disability. (Tr. 134.)  Her applications were denied initially and upon reconsideration. (Tr. 54-59.)  A hearing before ALJ Ronald Miller was held on April 30, 2009, and the plaintiff amended her onset date to March 27, 2006. (Tr. 14-39.)  The ALJ issued an unfavorable decision on June 3, 2009 (tr. 8-13), and the plaintiff sought review by the Appeals Council. (Tr. 4.) On November 20, 2009, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on March 9, 1984, and was 22 years old as of March 27, 2006, her alleged onset date. (Tr. 19.)  The plaintiff has a special education high school diploma but no vocationally relevant work experience. (Tr. 17, 28, 114-18.)

**A. Chronological Background: Medical Records[1]**

**1. Mental Health Treatment Notes**

Between March of 2005, and February of 2007, the plaintiff presented to Centerstone Community Mental Health Centers ("Centerstone") on multiple occasions and was treated by social workers and nurse practitioners. (Tr. 381-472.) The plaintiff related that she had anxiety (tr. 469) and fluctuating and depressed moods (tr. 432, 448-49), and she was diagnosed with major depressive disorder, recurrent and moderate; disruptive behavior disorder, not otherwise specified ("NOS"); reading disorder; borderline intellectual functioning; and mood disorder, NOS. (Tr. 377, 391, 398, 405, 409, 419, 429, 435, 443, 452, 463.) She was repeatedly assigned a GAF score of 40[2] (tr. 391, 398, 405, 409, 419, 429, 435, 443, 452, 463); was prescribed Wellbutrin[3] and Lamictal[4] (tr. 378-79, 386, 392, 399, 410-11, 420, 429, 436, 444, 453, 460, 464); and she reported that she was doing well, was stable on her medication, and that her mood had improved. (Tr. 382, 389, 395, 402, 416, 425, 458, 460, 466, 470.) Centerstone records also indicate that the plaintiff's behavior was appropriate (tr. 397, 404, 418, 427, 434, 462), that her appearance was appropriate, that her mood was

---

[1] The plaintiff "does not dispute" the ALJ's findings concerning her physical ability to perform work. Docket Entry No. 21, at 10. Therefore, the Court will focus on the medical evidence that addresses her mental limitations.

[2] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 31-40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* at 34.

[3] Wellbutrin is indicated for the treatment of major depressive disorder. Physicians Desk Reference 1720 (64th ed. 2010) ("PDR").

[4] Lamictal is an antiepileptic drug prescribed for bipolar disorder and mood episodes. PDR at 1522.

"euthymic," that her affect was appropriate and bright, and that her thought process was normal and coherent. (Tr. 393, 397, 404.)

The plaintiff returned to Centerstone between March of 2007, and April of 2009, on multiple occasions (tr. 599-676) and she reported that she had mood swings (tr. 657, 668) and a depressed mood (Tr. 555, 563, 576, 592.) During that two year period, the plaintiff was diagnosed with a mood disorder; a reading disorder (tr. 671); disruptive behavior disorder, NOS (tr. 643, 652, 660, 671); major depressive disorder, recurrent and moderate; and borderline intellectual functioning. (Tr. 548, 564, 581, 588, 643, 652, 660, 671.) She was assigned GAF scores of 46[5] (tr. 643, 652, 660, 671) and 48 (tr. 581, 588) and was prescribed Lamictal and Wellbutrin (tr. 644, 653, 661, 672), and Centerstone treatment notes indicate that her appearance was appropriate (tr. 556, 564, 586, 603, 642, 651, 659, 669), her mood was "euthymic" (tr. 642, 669), her behavior was appropriate (tr. 556, 564, 586, 642, 651, 659) and hypoactive (tr. 659), and her affect was appropriate (tr. 586, 642, 651), bright (tr. 670), and restricted. (Tr. 659.)

The September 18, 2007, Centerstone evaluation noted that the plaintiff babysits her cousins and goes to stores, church, and on family trips. (Tr. 586.) However, the plaintiff reported at that time that she had been without her medication for several months and her mood had deteriorated. (Tr. 583.) On December 17, 2007, the plaintiff related that she was "doing fairly well" and that her mood and ability to function improved. (Tr. 640.) Centerstone treatment notes also indicated that the plaintiff missed or canceled appointments on multiple occasions (tr. 380, 423-24, 431, 438, 446,

---

[5] A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

455-56, 468, 550, 599, 608, 626, 633, 636, 638, 647-48, 666) and that she "comes for awhile and then drops out of treatment." (Tr. 576.)

The plaintiff also had multiple Tennessee Clinically Related Group ("CRG") assessments completed at Centerstone. (Tr. 362-77.) The first CRG assessment was completed on March 13, 2005, and indicated that the plaintiff's activities of daily living and interpersonal functioning were markedly limited and that her concentration, task performance, and pace and ability to adapt to change were moderately limited. (Tr. 374-76.) The plaintiff was assigned a GAF score of 41 and was classified as a person who had a "Severe and Persistent Mental Illness."[6] (Tr. 376.) The second CRG assessment was completed on September 30, 2005, and indicated that the plaintiff's activities of daily living, ability to adapt to change, and concentration, task performance, and pace were markedly limited and that her interpersonal functioning was moderately limited. (Tr. 371-73.) She was assigned a GAF score of 40 and was classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 373.)

The third CRG assessment was completed on February 3, 2006, and indicated that the plaintiff's activities of daily living and concentration, task performance, and pace were markedly limited and that her ability to adapt to change and interpersonal functioning was moderately limited. (Tr. 368-70.) She was again assigned a GAF score of 40 and classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 370.) The fourth CRG assessment was completed on June 9, 2006, and indicated that the plaintiff's activities of daily living, interpersonal functioning, ability to adapt to change, and concentration, task performance, and pace were moderately limited.

_____

[6] A person with a "Severe and Persistent Mental Illness" was defined as "recently severely impaired and the duration of their severe impairment totals six months or longer of the past year." (Tr. 376.)

(Tr. 365-67.)  She was assigned a GAF score of 40 and was classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 367.)  The fifth CRG assessment was completed on November 10, 2006, and indicated that the plaintiff's activities of daily living, interpersonal functioning, and concentration, task performance, and pace were moderately limited and that her ability to adapt to change was mildly limited. (Tr. 362-64.)  She was assigned a GAF score of 46 and was classified as a person who was "Formerly Severely Impaired."[7] (Tr. 364.)

The sixth CRG assessment was completed on April 3, 2007, and indicated that the plaintiff's activities of daily living, interpersonal functioning, ability to adapt to change, and concentration, task performance, and pace were moderately limited. (Tr. 573-75.)  She was assigned a GAF score of 46 and was classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 575.)  The seventh CRG assessment was completed on August 6, 2007, and indicated that the plaintiff's activities of daily living, interpersonal functioning, and ability to adapt to change were markedly limited and that her concentration, task performance, and pace was moderately limited. (Tr. 570-72.)  She was assigned a GAF score of 46 and was classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 572.)  The eighth CRG assessment was completed on November 10, 2008, and indicated that the plaintiff's interpersonal functioning was markedly limited and that her activities of daily living, ability to adapt to change, and concentration, task performance, and pace were moderately limited. (Tr. 567-69.)  She was assigned a GAF score of 48 and was classified as a person who had a "Severe and Persistent Mental Illness." (Tr. 575.)

---

[7] A person who is "Formerly Severely Impaired is "not recently severely impaired but [has] been severely impaired in the past and need[s] services to prevent relapse." (Tr. 364.)

## 2. Psychological Evaluations

On March 29, 2006, Wyatt Harper, M.A., a psychological examiner, completed a psychological evaluation that included a diagnostic interview and the administration of a Personality Assessment Inventory ("PAI"),[8] Beck Depression Inventory-II ("BDI-II"),[9] and Wide Range Achievement Test 3 ("WRAT-3").[10] (Tr. 211-13.) Mr. Harper noted that the diagnostic interview revealed that the plaintiff had "depressive symptoms including insomnia, low self-esteem and feelings of hopelessness," that the PAI questionnaire showed that she had "prominent depression, extreme pessimism, and little sense of direction and purpose in life," and that she scored a 35 on the BDI-II exam, indicating that she "is in the lower end of the Severe range" of depression. (Tr. 213.) Mr. Harper diagnosed the plaintiff with severe major depressive disorder without psychotic features and borderline intellectual functioning, and he assigned her a GAF score of 47. *Id.*

Mr. Harper also completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on March 29, 2006 (tr. 209-10), and opined that the plaintiff's ability to understand, remember, and carry out detailed instructions was moderately limited; that her ability to "make judgments on simple work-related decisions," to

---

[8] The PAI is a self-report questionnaire that is "intended to provide information relevant to clinical diagnoses, treatment planning and screening for psychopathology." Center for Psychological Studies at NOVA Southeastern University, "Personality Assessment Inventory," at http://www.cps.nova.edu/~cpphelp/PAI.html.

[9] The BDI-II consists of a series of 21 questions "developed to measure the intensity, severity, and depth of depression in patients with psychiatric diagnosis." Encyclopedia of Mental Disorders, "Beck Depression Inventory," at http://www.minddisorders.com/A-Br/Beck-Depression-Inventory.html.

[10] The WRAT-3 measures basic skills in reading, arithmetic, and spelling. Encyclopedia of Mental Disorders, "Wide Range Achievement Test," at http://www.minddisorders.com/Py-Z/Wide-Range-Achievement-Test.html.

"[i]nteract appropriately with supervisors," to "[r]espond appropriately to work pressures in a usual work setting," and to "[r]espond appropriately to changes in a routine work setting" was markedly limited; and that her ability to "[i]interact appropriately" with the public and with co-workers was extremely limited.

On May 22, 2006, Dr. Rebecca P. Joslin, Ed.D., a non-examining consultant, completed a Psychiatric Review Technique Form ("PRTF") (tr. 224-37) and diagnosed the plaintiff with borderline intellectual functioning, depression, and anxiety. (Tr. 225, 227, 229.) She concluded that the plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decomposition. (Tr. 234.) Dr. Joslin based her opinion on Mr. Harper's psychological evaluation, Centerstone treatment notes, and the plaintiff's activities of daily living. (Tr. 236.) Dr. Joslin then completed a mental RFC assessment (tr. 238-41) and opined that the plaintiff was markedly limited in her ability to understand, remember and carry out detailed instructions and in her "ability to interact appropriately with the general public," and was moderately limited in her "ability to maintain attention and concentration for extended periods," in her "ability to complete a normal workday and workweek," in her "ability to accept instructions and respond appropriately to criticism from supervisors," in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and in her "ability to respond appropriately to changes in the work setting." (Tr. 238-39.)

On November 7, 2006, Timothy V. Murphey, a consultative evaluator with the Tennessee Department of Rehabilitation Services ("Voc Rehab"), completed a Vocational Analysis and noted that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions and in her "ability to interact appropriately with the general public." (Tr. 160.)

He concluded that, although the plaintiff had no past relevant work experience, she could "adjust to other work" as a hospital cleaner, furniture ripper, and machinery pager. (Tr. 161-62.)

On February 26, 2007, Dr. George T. Davis, Ph.D., a Tennessee Disability Determination Section ("DDS") nonexamining psychologist, completed a PRTF (tr. 473-86) and diagnosed the plaintiff with major depression, borderline intellectual functioning with a low to average IQ, and a personality disorder, evidenced by intense and unstable interpersonal relationships and impulsive and damaging behavior. (Tr. 476-77, 480.) He concluded that the plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decomposition. (Tr. 483.) Dr. Davis based his findings on Mr. Harper's psychological evaluation, Centerstone treatment notes, and the plaintiff's activities of daily living. (Tr. 485.) Dr. Davis also completed a mental RFC assessment (tr. 487-90) and opined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to complete a normal workday and workweek;" in her "ability to interact appropriately with the general public;" and in her "ability to respond appropriately to changes in the work setting." (Tr. 487-88.)

On March 5, 2007, Dr. C. Warren Thompson, Ph.D, a nonexamining DDS consultative psychologist, completed a DDS Medical Consultant Analysis (tr. 491-94) and found that the plaintiff suffered from mild to moderate limitations. (Tr. 492.) He also completed a PRTF (tr. 495-508) and diagnosed her with a reading disorder, major depressive disorder, mood disorder NOS, borderline intellectual functioning, and disruptive behavior disorder. (Tr. 496, 498-99, 502.) Dr. Thompson concluded that the plaintiff had mild restriction of activities of daily living; moderate difficulties in

maintaining social functioning, concentration, persistence, or pace; and no episodes of decomposition. (Tr. 505.) He based his findings on past psychological evaluations, treatment notes from Centerstone, and the plaintiff's activities of daily living and high school records. (Tr. 507.)

Dr. Thompson also completed a mental RFC on March 5, 2007 (Tr. 509-12), and noted that the plaintiff was moderately limited in her "ability to understand and remember detailed instructions;" in her "ability to maintain attention and concentration for extended periods;" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" in her "ability to complete a normal workday and workweek;" in her "ability to interact appropriately with the general public;" in her "ability to accept instructions and respond appropriately to criticism from supervisors;" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and in her "ability to respond appropriately to changes in the work setting." (Tr. 509-10.)

On April 5, 2007, Teresa N. Cartwright, a consultative evaluator with Voc Rehab, completed a Vocational Analysis and noted that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" in her "ability to complete a normal workday and workweek;" in her "ability to interact appropriately with the general public;" in her "ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes;" in her "ability to accept instructions and respond appropriately to criticism from supervisors;" and in her "ability to respond appropriately to changes in the work setting."

(Tr. 176.) She concluded that, although the plaintiff had no past relevant work experience, she could "adjust to other work" as a house cleaner, thread cutter, and "tirmer." (Tr. 177-78.)

On December 1, 2008, Dr. C.B. Perkins, Ph.D., a consultative psychological examiner, completed a psychological evaluation (tr. 678-82), and noted that the plaintiff reported that she was bi-polar and learning disabled and that her activities of daily living consisted of waking up early, taking "her dog out," listening to music, dressing, doing household chores, and occasionally attending church. (Tr. 679.) Dr. Perkins opined that the plaintiff could not "perform sustained work activity for four hours" and administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III")[11] test to the plaintiff. (Tr. 680.) Her verbal IQ score was 82 , her performance IQ score was 94, and her full scale IQ score was 87, which reflects "low average to average intellectual functioning." *Id.* He also administered the Woodcock-Johnson Educational Achievement Test (WJ-R),[12] which indicated that the plaintiff exhibited "low average intellectual functioning," had "major deficits which reflect specific learning disabilities," and functioned "at about a third to fourth grade level." (Tr. 681.) Dr. Perkins diagnosed the plaintiff with "a broad reading disorder," disorders of "written expression," mixed anxiety, a depressed mood, and "low average intellectual functioning," and he assigned her a GAF score of 45. (Tr. 682.)

On December 11, 2008, Mary Scott, an evaluator with Voc Rehab, examined the plaintiff and completed a Vocational Evaluation Report (tr. 683-89), noting that the plaintiff did not have a driver's license. She estimated the plaintiff's full scale IQ score to be 108 (tr. 684) and determined

---

[11] The WAIS-III "is intended to measure human intelligence reflected in both verbal and performance abilities." Encyclopedia of Mental Disorders, "Wechsler Adult Intelligence Scale," at http://www.minddisorders.com/Py-Z/Wechsler-adult-intelligence-scale.html.

[12] The WJ-R "is a comprehensive set of tests for measuring achievement abilities." (Tr. 681.)

that the plaintiff possessed "a high level of dysfunctional thinking in [e]xternal [c]onflict . . . [and] may have difficulty assuming responsibility in decision-making." (Tr. 687.)  On December 18, 2008, Betty Beard, a Voc Rehab counselor, completed a one-page Certification of Eligibility/Ineligibility and found that the plaintiff has a "physical or mental disability which constitutes or results in a substantial impediment to employment." (Tr. 677.)  She explained that the plaintiff would have difficulty reading and understanding written instructions on a job and that the plaintiff "has minimal or no marketable skills due to the disability." *Id.*

Between March 16, 2009, and March 23, 2009, Trevecca Griffin, an evaluator with Voc Rehab, examined the plaintiff and completed Vocational Evaluation Reports (tr. 690-97), noting that the plaintiff was examined by Dr. John Hill, a Voc Rehab psychologist, on March 17, 2009.[13] (Tr. 694.)  According to Ms. Griffin, the plaintiff reported to Dr. Hill that she suffered from chronic sadness and anxiety and that her mood was "unpredictable." *Id.*  Dr. Hill noted that she exhibited no "overt signs of depression" but "appears to have some level of emotional instability and it is suspected that she is not predictable in her personal manner or productivity from one day to the next" and that "she has histrionic and self-defeating features that have resulted in lack of life progress." *Id.*  Dr. Hill concluded that it was "unlikely that [the plaintiff] has sufficient work readiness skills for employment and doubtful that she has the self-discipline to maintain employment - she will probably require JOBS [Job Objective and Behavioral Services] for success" and that "she could benefit from Anger Management and Self Control Groups." *Id.*

---

[13] Dr. Hill's assessment itself is not in the record.

## B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by a non-attorney advocate,[14] and the plaintiff and Dr. Pedro M. Roman, a vocational expert ("VE"), testified. (Tr. 14-38.) The plaintiff testified that she graduated high school with a special education diploma, that she has been diagnosed with asthma and sleep apnea, and that she uses a continuous positive airway pressure breathing therapy ("C-PAP") machine. (Tr. 17-18.) The plaintiff related that she last worked as a counter worker at a dry cleaner for two months before March 27, 2006 (her amended onset date), and that she got along "fine" with her coworkers, who were "kids [her] age." (Tr. 19-20.) The plaintiff testified that she is able to "stand and walk for a while, and sit and walk for awhile" but that she has to alternate positions. (Tr. 22.) She related that she is not able to work due to her inability to get along well with others, her inability to stand for extended periods of time, her asthma, her forgetfulness, and her inability to deal with stress. (Tr. 22-25.)

The VE confirmed that his testimony would be consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 27.) The ALJ asked the VE to consider what type of work the plaintiff could perform if she were able to lift/carry 50 pounds occasionally and 25 pounds frequently; were able to stand/walk or sit for 6 hours "out of a day;" were able to stoop, crouch, kneel, crawl, climb, and balance occasionally; were not able to work around unprotected heights, dangerous machinery, or humidity; had some difficulty with maintaining concentration, persistence, and pace; and was able to remember simple tasks but had "some difficulty with detailed tasks and instruction," with interacting with others, and with adapting to change. (Tr. 28-29.) The VE

---

[14] Although both the plaintiff and the defendant indicate that the plaintiff was represented by an attorney, the ALJ referred to her representative as a "non-attorney representative."

answered that the plaintiff could perform work as a cleaner, a deliverer of merchandise, and a production worker, and that each of these jobs was classified as medium and unskilled work. (Tr. 31-33.)

Next, the ALJ asked the VE to determine what type of work the plaintiff could perform if she could lift/carry up to 20 pounds, sit for eight hours, stand/walk for four to six hours, and had all of the other same limitations in the first hypothetical. (Tr. 29.)  The VE replied that she could work as a cleaner, a deliverer of merchandise, a food services production worker, and an assembler of small products, and that each of these positions was classified as light and unskilled work. (Tr. 31-33.)  The VE testified that, if the plaintiff had to avoid exposure to dust, fumes, and gases, she could not work as a cleaner but could work as a laborer in stores and that position could be classified as either medium or light and unskilled work. (Tr. 34-35.)  He then testified that the plaintiff would be precluded from working if she had "moderately severe limitations of ability to maintain functioning in the work environment." (Tr. 36.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on June 3, 2009. (Tr. 8-13.)  Based on the record, the ALJ made the following findings:

1.  The claimant has never engaged in substantial gainful activity.

2.  The medical evidence establishes that the claimant has "severe" impairments, including morbid obesity, asthma, major depressive disorder, and a learning disorder, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.  The subjective complaints are not persuasive for the reasons given above.

4.      The claimant has the residual functional capacity to perform medium work with the additional physical and mental limitations given above.

5.      The claimant has no past relevant work.

6.      The claimant is 25 years old, which is defined as a younger individual.

7.      The claimant has a high school special education diploma.

8.      The claimant does not have any acquired work skills, which are transferrable to the skilled or semiskilled work functions of other work.

9.      Based on an exertional capacity for medium work and the claimant's age, education, and work experience, section 416.969 of the Regulations No. 16 and Rule 203.28, Table No. 3, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

10.     Although the claimant's additional non-exertional limitations do not allow her to perform the full range of medium work, using the above-cited rule as a framework for decision-making and based on the vocational expert's testimony, there are a significant number of jobs in the economy which she could perform. Examples and numbers of such jobs are named above.

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 12-13.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). *See also Parks v. Soc. Sec. Admin.*, 413 Fed. Appx. 856, 864 (6th Cir. Mar. 15, 2011) ("In order to affirm the Commissioner's decision, we need not "agree with the Commissioner's finding, as long as it is substantially supported in the record.") (quoting *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 12-13.)  At step one, the ALJ found that the plaintiff demonstrated that she had never engaged in substantial gainful activity. (Tr. 12.)  At step two, the ALJ determined that the plaintiff's morbid obesity, asthma, major depressive disorder, and learning disorder were severe impairments. *Id.*  At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ determined that the plaintiff had no past relevant work experience but that she had an RFC to perform a limited range of medium work. (Tr. 12-13.)  At step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a "deboner laborer," deliverer of merchandise, and food services production worker. (Tr. 12-13.)

**C. Plaintiff's Assertions of Error**

The plaintiff asserts that the ALJ failed to properly evaluate the opinions of her treating sources, including the GAF scores assigned to her, and thus relied on the VE's responses to inaccurate hypotheticals that did not accurately portray her mental limitations. Docket Entry No. 21, at 12-19.

The plaintiff contends that the ALJ did not properly evaluate the medical findings of her treating medical sources, Centerstone, Mr. Harper, and Dr. Perkins. Docket Entry No. 21, at 12-17. Specifically, the plaintiff argues that the ALJ erred in concluding that the GAF scores that Centerstone, Mr. Harper, and Dr. Perkins assigned to her were inconsistent with the medical evidence in the record. *Id.* at 15-17.

The plaintiff appears to classify Centerstone, Mr. Harper, and Dr. Perkins as her treating sources. According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[15] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31,

---

[15] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927]* . . . .'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at \*4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 416.927(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at \*5 (citing 20 C.F.R. § 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[16] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

In this case, Centerstone, Mr. Harper, and Dr. Perkins are not acceptable treating sources. Although the plaintiff presented to Centerstone on numerous occasions, she was repeatedly

---

[16] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

evaluated by social workers and nurse practitioners (tr. 381-472, 599-676), who are not classified as acceptable medical sources but as "other sources."[17] 20 C.F.R. § 404.1513(d). Mr. Harper and Dr. Perkins, although considered acceptable medical sources, are not treating sources since they each only examined the plaintiff on one occasion. Tr. 209-13, 678-82. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502).

Even though Mr. Harper, Dr. Perkins, and Centerstone are not acceptable treating sources, and thus the treating physician rule does not apply to them, the ALJ still must consider their medical findings. Mr. Harper and Dr. Perkins are consultative examining sources and the Regulations require the ALJ to evaluate their medical findings in light of

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion

---

[17] The Regulations define other sources as
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).
20 C.F.R. § 404.1513(d).

with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. § 416.927(d)(2)-(6). Centerstone is classified as an "other source" and Social Security

Ruling ("SSR") 06-03p has noted that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540,

at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p clarified the treatment of "other sources" by

explaining that

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5 (quoted in *Roberts v. Astrue*, 2009 WL 1651523, at 7 (M.D. Tenn.

June 11, 2009) (Wiseman, J.).

In this case, the ALJ focused on the factor of inconsistency in assigning less than significant weight to the findings of Mr. Harper, Dr. Perkins, and Centerstone. 20 C.F.R. § 416.927(d)(2)-(6). The ALJ determined that the functional limitations Mr. Harper assigned to the plaintiff, including a GAF score of 47, were inconsistent with Centerstone treatment notes and "more recent Vocational Rehabilitation testing;" that the GAF score of 45 that Dr. Perkins assigned to her was inconsistent with the findings in his psychological evaluation; and that the GAF scores "in the 40s" assigned to her in Centerstone CRG forms were "inconsistent functional limitations contained in the same CRG forms." (Tr. 10-11.) However, the ALJ failed to identify or specifically address how the plaintiff's assigned GAF scores "in the 40s" are inconsistent with Centerstone treatment notes and CRG forms, "recent Vocational Rehabilitation testing," and Dr. Perkins's psychological evaluation.

First, Centerstone treatment notes (tr. 391, 398, 405, 409, 419, 429, 435, 443, 452, 463, 581, 588, 643, 652, 660, 671) and Centerstone CRG forms (tr. 362-77, 567-75) all indicate that the plaintiff was repeatedly assigned GAF scores in the 40's. In fact, Dr. Mark Petro, Ph.D., a DDS consultative psychologist, was the only evaluator to assign the plaintiff a GAF score higher than the 40's,[18] but his examination was in November 2004, before the plaintiff's amended onset date. (Tr. 197-98.) Next, Dr. Perkins noted in his psychological evaluation that the plaintiff could not "perform sustained work activity for four hours" (tr. 680) and he diagnosed her with mixed anxiety, a depressed mood, and lower than average intellectual functioning. (Tr. 681-82.) Further, it is not clear how the plaintiff's assigned GAF scores are "inconsistent with the level and variety of functional limitations" contained in the Centerstone CRG forms. (Tr. 11.) The Centerstone CRG

---

[18] Dr. Petro assigned the plaintiff a GAF score of 55. (Tr. 197.) A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 43.

forms repeatedly indicated that the plaintiff's ability to perform activities of daily living, interpersonal functioning, ability to adapt to change, and ability to maintain concentration, persistence, and pace were moderately to markedly limited. (Tr. 362-77, 567-75.)  Just as the Centerstone CRG forms show that, over more than a three year period, the plaintiff's functional limitations were consistently moderate to marked, the same forms reveal that she consistently was assigned GAF scores in the 40's. *Id.*  Although it is not clear that there is an established correlation between functional limitation assessments in CRG forms and GAF scores, it is clear that both remained consistent during the plaintiff's treatment at Centerstone. *Id.*

The plaintiff correctly points out that in *Bratton v. Astrue*, 2010 WL 2901856, at *8 (M.D. Tenn. July 19, 2010) (Nixon, J.), this Court noted that "[a] GAF score can be helpful in assessing an individual's mental RFC." Docket Entry No. 27, at 1-2.  However, the Court also explained that

> [a]t the same time, the Sixth Circuit recognizes that a GAF score is a physician's subjective evaluation and not raw medical data. *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007).  The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed.Reg. 50,745, 50,764-765 (Aug. 21, 2000); see also *Kennedy*, 247 Fed. Appx. at 766; *DeBoard v. Comm'r Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006).  In *Kennedy*, the Sixth Circuit rejected an ALJ's finding of an "improvement in mental functioning" based on improved GAF scores when there was not other substantial evidence in the record to support the finding. *Kennedy*, 247 Fed. Appx. at 766.

*Bratton*, 2010 WL 2901856, at *8. *See also Oliver v. Comm'r of Soc. Sec.*, 415 Fed. Appx. 681, 684 (6th Cir. Mar. 17, 2011) ("A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues."). Therefore, while a GAF score is not dispositive in determining an individual's mental RFC, it can be one of several factors weighed or considered in assessing an individual's mental RFC, *see Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. Feb. 9, 2006) ("A GAF

score may help an ALJ assess mental RFC, but it is not raw medical data. Rather it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning"), and it can be useful in evaluating the consistency of a physician's treatment notes. *Bratton*, 2010 WL 2901856, at *8 ("[There is] no indication that using Plaintiff's GAF scores [to evaluate the consistency and credibility of a physician's opinion] is inappropriate or different than an ALJ's normal assessment of consistency within a physician's treatment records.").

Although the ALJ erred in concluding that the GAF scores that Centerstone, Mr. Harper, and Dr. Perkins assigned to the plaintiff were inconsistent with Centerstone treatment notes, Centerstone CRG forms, and Dr. Perkins's psychological evaluation, the ALJ's determination that the plaintiff is not disabled and can perform work will be upheld if it is supported by substantial evidence in the record. As discussed *supra*, substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d at 854; *Parks v. Soc. Sec. Admin.*, 413 Fed. Appx. at 864.

The ALJ adopted the findings of Dr. Thompson, a nonexamining consultative DDS psychologist, and concluded that the plaintiff had "some but not substantial difficulty maintaining concentration, persistence, or pace, can remember simple tasks and some difficulty with detailed tasks and instructions, would have some difficulty interacting with others, but can still do so, and would have some but not substantial difficulty adapting to change." (Tr. 11.) However, the only explanation that the ALJ provided for adopting Dr. Thompson's findings is that the findings were

"generally well supported." *Id.* The ALJ did not indicate how Dr. Thompson's evaluation was "well supported" by the record medical evidence nor did he refer to specific medical findings that supported Dr. Thompson's findings. Thus, the ALJ failed to provide "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

In sum, the ALJ erred in concluding that the GAF scores that Centerstone, Mr. Harper, and Dr. Perkins assigned to the plaintiff were inconsistent with other medical record evidence, and, more importantly, he failed to provide the requisite support for assigning significant weight to the findings of Dr. Thompson. Therefore, this case must be remanded for the ALJ to provide specific reasons for the weight he assigned Dr. Thompson's findings and to explain how his findings are "generally well supported." (Tr. 11.)

The Court will not address the plaintiff's remaining allegation of error (Docket Entry No. 21, at 18-19) since the ALJ's evaluation of Dr. Thompson's medical findings, the weight that he assigns those findings, and the record medical evidence upon which he relies may affect the hypotheticals that he poses to the VE and whether those hypotheticals are supported by substantial evidence in the record.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 20) be GRANTED to the extent that the case should be remanded to the ALJ to properly evaluate and explain the weight assigned to Dr. Thompson's findings.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge